UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
NICOLE K. WOODS,

                Plaintiff,

      -against-                        **MEMORANDUM AND ORDER**
                                                       No. ~~07-CV-1175~~ (FB) (RER)
COMPUTER HORIZONS CORPORATION,        05CV 3195

                Defendant.
------------------------------------------------------------x

*Appearances:*
*For the Plaintiff:*
AMBROSE W. WOTORSON, JR., ESQ.
Law Office of Ambrose Wotorson
26 Court Street, Suite 1811
Brooklyn, NY 11242-1118

*For Defendant:*
DAVID W. GARLAND, ESQ.
WILLIAM R. HORWITZ, ESQ.
Sills Cummis & Gross, P.C.
One Rockefeller Plaza
New York, NY 10020

**BLOCK, Senior District Judge:**

       Plaintiff, Nicole K. Woods ("Woods"), sues her former employer, defendant, Computer Horizons Corporation ("CHC"). She alleges (1) that CHC violated 42 U.S.C. § 1981, the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Admin. Code § 8-107, by terminating her based on her race; and (2) that CHC violated the NYSHRL and NYCHRL by terminating her based on a pregnancy-related disability, and also by failing to reasonably accommodate that disability.

       Pursuant to Federal Rule of Civil Procedure 56, CHC moves for summary judgment on the ground that Woods has failed to offer sufficient evidence to create a genuine issue of material fact on either claim. The Court held oral argument on March 18, 2008. For the following reasons, the motion is granted as to Woods' claim of race

discrimination; the Court declines to exercise supplemental jurisdiction over her claim of disability discrimination under state and local law.

## BACKGROUND

The following facts are taken from the parties' Rule 56.1 statements and supporting documentation; except where indicated, they are not in dispute:

CHC hires individuals and assigns them to Information Technology ("IT") positions with its clients. CHC hired Woods, an African-American woman, in November 2000, and assigned her to work as a help-desk analyst for the New York City Department of Information Technology and Telecommunications ("DOITT").

Woods' initial salary was $40,000/year. After her first year, she began asking for a raise; her request did not bear fruit until December 2002, when she received a $5,000/year increase. At the time, only one other CHC employee, Anastasia Simon ("Simon"), was working for DOITT; Simon, who is also African-American, received a raise in an unknown amount some time before Woods received hers. Shortly before Woods received her raise, CHC assigned another new employee, "Brianna," to DOITT; Brianna, who is white, received a starting salary of $50,000/year. There is no evidence of Brianna's qualifications or experience vis-à-vis Woods.

In January 2003, Woods learned that she was pregnant with her second child. In response to her inquiry, CHC's Human Resources Leave Administrator, Michelle Backhus ("Backhus"), informed her that she was eligible for four weeks of leave at 100% pay and eight weeks of leave at 50% pay; under CHC's leave policy, the first five days of leave was required to be taken as vacation or sick leave. In response to a follow-up

inquiry, CHC's Human Resources Manager, Janice Toscano ("Toscano"), informed Woods that under the federal Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-19, her job would be protected for up to twelve weeks.

On May 9, 2003, Woods' physician advised her to stop working; however, Woods continued to work because she did not have any vacation or sick time, and was unwilling to go without pay during the five-day waiting period before paid disability leave could begin. On May 12, 2003, Toscano instructed Woods to follow her doctor's orders and leave work immediately; Woods complied, and subsequently submitted an application for FMLA leave accompanied by a doctor's note stating that she would not be able to return to work until November 9, 2003.

On May 23, 2003, CHC sent Woods a memorandum informing her that her application for FMLA leave had been approved. According to the memo, Woods' leave began on May 12, 2003, and would end on November 9, 2003; in addition, it stated that the leave could be extended if necessary due to a serious medical condition. While Woods was on leave, her assignment at DOITT was covered by Christopher Thompson, a white man.

Woods had a Caesarian delivery on September 5, 2003. On October 23, 2003, Toscano requested an update on Woods' condition and requested a doctor's note explaining when she could be expected to return to work. In response, Woods requested an extension of her leave and submitted a doctor's note that she would be able to return to work without restrictions on December 5, 2003. At some point prior to December 5th, Woods had a conversation with Toscano in which Toscano told her that she might not be able to return to her assignment at DOITT because "they" liked Thompson better.

3

On November 3, 2003, Woods emailed Toscano to confirm that she planned to return to work on December 5th. In her email, Woods asked where she would be assigned upon her return; contemplating the possibility that an assignment might not be ready by her return date, she asked, "How long is it before CHC realize that there isnt any work available and as a result terminate me? [sic]" Decl. of David W. Garland ("Garland Decl."), Ex. 20. Woods further noted that Thompson was supposed to be only a temporary replacement and asked, "What transpired that I cannot return to DOITT?" *Id.*

When Toscano learned that Woods planned to return to work on December 5th, she checked CHC's database of job openings, but found no vacant positions. She thereafter distributed Woods' résumé to CHC salespeople with a request to check with clients for a possible position for Woods; in addition, the CHC vice president in charge of governmental clients searched for suitable job openings with other New York City agencies. All efforts to find another assignment for Woods were unsuccessful.

On December 9, 2003, Toscano emailed Woods to inform her that there were no suitable positions for her, and that December 5th would be deemed her last day of employment. Toscano further stated that CHC "will continue to look for assignments with you in mind and contact you if anything does come up." Garland Decl., Ex. 21.

The number of CHC's employees assigned to DOITT increased over time, reaching 24 by December of 2003. Of those 24, 9 were white, 8 were African-American, 3 were Hispanic and 4 were Asian/Pacific Islander.

The central factual dispute involves the circumstances of Woods' termination. By affidavit, CHC Vice President Jane Fishkow ("Fishkow") stated that she called Rick

Miner ("Miner"), the director of DOITT's call center, in October or November of 2003 to inform him of Woods' expected return to work. According to Fishkow, Miner told her that he preferred to continue working with the current help-desk staff, including Thompson. Miner also told Fishkow that DOITT had no other positions for Woods. Miner's affidavit confirms this version of events, and adds that the decision to keep Thompson was made after conferring with Iris Olmeida ("Olmeida"), the DOITT employee who directly supervised Woods.

Woods, by contrast, relies on Olmeida's affidavit, in which she states that Miner told her in late October or early November of 2003 that Woods would be on maternity leave until December 5, 2003, and would be assigned to a new "311" help desk at DOITT when she returned; he never suggested that Thompson should replace Woods. Indeed, according to Olmeida, when she discussed the situation with Miner, both expressed dissatisfaction with Thompson's performance, timeliness and attendance. Sometime after December 5th, DOITT communicated this dissatisfaction to CHC; Thompson's assignment with DOITT was thereafter terminated. Woods also cites Toscano's deposition testimony that Miner told CHC, "I have no room, no budget." Affirmation of Ambrose Wotorson, Ex. 26, at 24.

## DISCUSSION

### A. Race Discrimination

Claims of race discrimination under § 1981 are governed by the familiar burden-shifting analysis of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). *See Martin v. Citibank, N.A.*, 762 F.2d 212, 216-17 (2d Cir. 1985). The same analysis governs claims under

the NYSHRL and NYCHRL. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000).

Under *McDonnell Douglas*, the plaintiff must first proffer evidence to make out a *prima facie* case of discrimination. *See Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004). "Once the plaintiff satisfies his initial, minimal, burden, the burden of production shifts to the employer to articulate some legitimate, nondiscriminatory reason for the termination, supported by admissible evidence which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* (internal quotation marks and citations omitted). "If the employer carries this burden, the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Id.* (quoting *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

## 1. *Prima Facie Case*

"In order to establish a *prima facie* case of discriminatory discharge in violation of . . . § 1981, a plaintiff must show (1) that he belongs to a protected class, (2) that he was performing his duties satisfactorily, (3) that he was discharged, and (4) that his discharge occurred in circumstances giving rise to an inference of discrimination on the basis of his membership in that class." *McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997). CHC does not dispute that Woods has satisfied the first three elements.

With respect to the fourth element, CHC argues that the mere fact that Thompson replaced Woods is insufficient to create an inference of discrimination. In response, Woods argues that she also submitted evidence that she was not given a raise for nearly two years. "A showing of disparate treatment – that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group – is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003). Woods' evidence regarding her pay, however, does not reveal disparate treatment; the other black CHC employee working at DOITT received a raise sometime before Woods did, and although Woods and the subsequently hired white employee performed similar jobs for DOITT, there is no evidence that they were similarly situated in terms of qualifications and experience. *See id.* ("A plaintiff relying on disparate treatment evidence must show she was similarly situated in all material respects to the individuals with whom she seeks to compare herself." (internal quotation marks and citations omitted)).

In any event, the fact that Woods was replaced by Thompson is sufficient to make out a *prima facie* case. The Second Circuit has squarely held that the fourth element may be satisfied by evidence that plaintiff "was replaced by someone not a member of his protected class." *De La Cruz v. New York City Human Resources Admin.*, 82 F.3d 16, 20 (2d Cir. 1996).

## 2. *Legitimate, Non-Discriminatory Reason/Pretext*

As a legitimate, non-discriminatory reason for Woods' termination, CHC has proffered evidence that DOITT preferred to retain her replacement, and that there were no

7

other suitable assignments for her. In response, Woods argues that Olmeida's affidavit – in which she attests that she and Miner were both dissatisfied with Thompson's performance – creates a genuine issue of material fact as to the veracity of CHC's proffered reason.[1]

CHC argues that Olmeida's affidavit must be disregarded as hearsay; the Court disagrees. Miner's discussions with Olmeida might well be hearsay if offered to prove that Thompson's performance was, in fact, unsatisfactory. But it also tends to prove that Miner's opinion of Thompson was not as positive as his affidavit suggests. Where a statement is offered as circumstantial evidence of what the declarant knew or believed, "it does not fall within the definition [of hearsay] because it was not offered to prove the truth of the matter asserted." *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988); *see also Smith v. Duncan*, 411 F.3d 340, 346 n.4 (2d Cir. 2005) (noting that recorded statement would not be hearsay because it "would not be offered to show that gang members were *actually* coming, but rather to show that Smith believed they were coming"). Thus, Olmeida's affidavit supplies admissible evidence that tends to refute CHC's contention that Miner told them that DOITT preferred to keep Thompson.

"Evidence of pretext, however, even combined with the minimal showing

---

[1]Woods also relies on Toscano's deposition testimony; however, Toscano's recollection that Miner told CHC that he had no budget or room for Woods is fully consistent with Miner's statement that he told CHC that DOITT had no available positions for Woods. Moreover, it is unclear how Toscano would have personal knowledge of Miner's explanation because she testified that it was not she, but Fishkow, who spoke to him.

8

necessary to establish a prima facie case under the burden-shifting scheme in *McDonnell Douglas*..., does not mandate a denial of summary judgment." *Lizardo v. Denny's, Inc.*, 270 F.3d 94, 103 (2d Cir. 2001). As the Supreme Court observed in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000):

> [A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated. . . .
>
> This is not to say that such a showing by the plaintiff will *always* be adequate to sustain a jury's finding of liability. Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory. For instance, an employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Id.* at 148. Applying *Reeves*, the Second Circuit has held "in several cases that a record that included evidence of a prima facie case and evidence permitting a finding of pretext did not suffice to permit a finding of discrimination." *Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 382 (2d Cir. 2001) (citing *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87 (2d Cir. 2001), *James v. New York Racing Ass'n*, 233 F.3d 149 (2d Cir. 2000), and *Schnabel v. Abramson*, 232 F.3d 83 (2d Cir. 2000)).

Under *Reeves*, "the court must examine the entire record to determine if plaintiffs meet their ultimate burden of persuading the fact-finder of a central element of a 1981 claim: namely, that defendants intentionally discriminated against them on the basis

9

of their race." *Lizardo*, 270 F.3d at 103. Whether summary judgment is appropriate in any particular case depends on a number of factors, including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case." *Reeves*, 530 U.S. at 148-49.

Here, Woods *prima facie* case – consisting solely of the bare fact that she was replaced with a white man – is weak. More importantly, other evidence strongly supports CHC's case. Woods does not dispute that CHC provided DOITT with a diverse workforce that included seven other African-Americans; yet there is no evidence that any other minority worker was replaced at DOITT or laid off by CHC. Moreover, Woods does not dispute that CHC made extensive – though unsuccessful – efforts to find another assignment for her. Given these circumstances, no reasonable fact-finder could conclude that CHC terminated Woods based on her race.

## B. Disability Discrimination

At oral argument, Woods' counsel conceded that Woods is not pursuing claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-213, or the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k) (defining sex discrimination under Title VII to include discrimination "on the basis of pregnancy, childbirth, or related medical conditions").[2] Since her disability claim is based solely on state and local law, the Court

---

[2]Nor does Woods sue under the FMLA. Accordingly, the Court is not called upon to determine whether an employer's actions can effectively extend the twelve weeks of protected leave required by statute. *See Ragsdale v. Wolverine Worldwide, Inc.*, 218 F.3d 933, 937 (8th Cir. 2000) ("Under the FMLA, twelve weeks of leave is both the minimum the employer must provide and the maximum that the statute requires. The provisions of the FMLA are noticeably bereft of any purpose to interfere with employer

must consider whether to exercise supplemental jurisdiction under 28 U.S.C. § 1367.

Under 28 U.S.C. § 1367(c), a district court "may decline to exercise supplemental jurisdiction" if, among other circumstances, "the district court has dismissed all claims over which it has original jurisdiction." As the Court noted in *Drake v. Laboratory Corporation of America Holdings*, 323 F. Supp. 2d 449 (E.D.N.Y. 2004), the Second Circuit has set forth several factors to be considered when deciding whether to exercise supplemental jurisdiction: "(1) whether state law claims 'implicate[] the doctrine of preemption,' . . . (2) 'judicial economy, convenience, fairness, and comity,' . . . (3) the existence of 'novel or unresolved questions of state law,' . . . (4) whether state law claims 'concern the state's interest in the administration of its government.'" *Id.* at 452 (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003)).

Where, as here, all federal claims have been eliminated before trial, concerns of judicial economy, convenience, fairness and comity usually "point toward declining to exercise jurisdiction over the remaining state-law claims." *Valencia*, 316 F.3d at 305. Comity is particularly important here because "the definitions of disability under the [NYSHRL] and the [NYCHRL] are broader than the ADA definition." *Giordano v. City of New York*, 274 F.3d 740, 753 (2d Cir. 2001). Thus, the Court concludes that the question of

---

leave policies which grant greater leave rights than the FMLA or to require more generous leave plans than the minimum twelve weeks of unpaid leave mandated by the FMLA."), *aff'd*, 535 U.S. 81 (2002); *McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1308 (11th Cir. 1999) ("The statute does not suggest that the 12 week entitlement may be extended . . . . Where an employer such as defendant exceeds the baseline 12 weeks by providing not only more leave than FMLA but also paid leave, the employer should not find itself sued for violating FMLA.").

11

whether Woods' pregnancy and its attendant medical consequences constitute a "disability" is more appropriately answered by a state court. *Cf. id.* at 754 ("We think that in the absence of any remaining federal claims, the appropriate analytic framework to be applied to discrimination claims based on a 'disability' as defined by New York state and municipal law is a question best left to the courts of the State of New York.").

## CONCLUSION

CHC's motion for summary judgment is granted. Woods' claim of race discrimination is dismissed with prejudice; her claim of disability discrimination is dismissed without prejudice to refiling in state court. *See* 28 U.S.C. § 1367(d) (providing for tolling of state statutes of limitations while state-law claims are pending in federal court).

**SO ORDERED.**

/signed/

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
March 18, 2008